IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 08-614 |
| HABEEB MALIK | : | |
| IRA WEINER | : | |
| THONGCHAI VORASINGHA | : | |

**SURRICK, J.**                                                                            **DECEMBER  7  , 2009**

## MEMORANDUM

Presently before the Court are Defendant Habeeb Malik's Post-Trial Motion for Judgment of Acquittal Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure (Doc. No. 104), Defendant Ira Weiner's Motion for Judgment of Acquittal Pursuant to Rule 29, or, in the Alternative, Motion for New Trial Pursuant to Rule 33 (Doc. No. 105), Defendant Thongchai Vorasingha's Joinder in Defendant Ira Weiner, D.O.'s Motion for Judgment of Acquittal Pursuant to Rule 29, or, in the Alternative, Motion for a New Trial Pursuant to Rule 33 (Doc. No. 108), and Defendant Habeeb Malik's Joinder in Defendant Ira Weiner, D.O.'s Motion and Reply Memorandum for Judgment of Acquittal Pursuant to Rule 29, or, in the Alternative, Motion for a New Trial Pursuant to Rule 33 (Doc. No. 117).  For the following reasons, Defendants' Motions are denied.

## I.     PROCEDURAL BACKGROUND

On October 2, 2008, Defendants Habeeb Malik, Dr. Ira Weiner, and Dr. Thongchai Vorasingha were indicted on one count of conspiracy to commit naturalization fraud in violation of 18 U.S.C. § 371 (Count One).  In addition, the grand jury indicted Malik on eleven counts of naturalization fraud in violation of 18 U.S.C. § 1425 (Counts Two through Twelve) and four

counts of filing false tax returns in violation of 26 U.S.C. § 7206(1) (Counts Thirteen through Sixteen). Weiner was indicted with Malik on nine of the eleven naturalization fraud counts (Counts Two through Ten). Vorasingha was indicted with Malik on the two remaining naturalization fraud counts (Counts Eleven and Twelve). (*See* Doc. No. 1.)[1]

On July 20, 2009, a jury found Malik, Weiner, and Vorasingha guilty of conspiracy to commit naturalization fraud. (Doc. No. 98.) The jury also found Malik guilty of ten counts of naturalization fraud and four counts of filing false tax returns. The jury found Weiner guilty of eight counts of naturalization fraud and Vorasingha guilty of two counts of naturalization fraud. The jury found Malik and Weiner not guilty of one of the naturalization fraud counts (Count Seven). Malik, Weiner, and Vorasingha now seek relief pursuant to Federal Rules of Criminal Procedure 29 and 33 on the grounds that the Government did not prove the single conspiracy alleged in the Indictment and that the evidence was not sufficient to support the jury's findings. (*See* Doc. No. 104 ¶ 2; Doc. No. 105; Doc. No. 108.)

## II.     FACTUAL BACKGROUND[2]

From 2000 through 2005, Malik operated a business known as the Foundation of Human Services ("the Foundation"). The Foundation, at least in part, assisted foreign individuals in obtaining United States citizenship. Foreign individuals must be able to speak, read, and write basic English to be eligible for United States citizenship. Those who are unable to meet this

---

[1] On Counts Two through Twelve, Defendants were also charged with aiding and abetting pursuant to 18 U.S.C. § 2.

[2] This summary of the facts is based primarily on information in the Indictment and is provided only for context. All factual inferences and legal conclusions in this Memorandum are based on evidence presented at trial, in accordance with the appropriate legal standards, and not the allegations in the Indictment.

requirement because of some physical or mental impairment can apply for a waiver. The waiver, INS Form N-648, is a standardized form that must be completed by a physician or clinical psychologist. An applicant is eligible for a waiver if a physical or mental impairment prevents him or her from learning or demonstrating knowledge of the English language, or basic history and the principles and form of government of the United States. The physician or psychologist must provide a diagnosis of the applicant's problem and a conclusion with regard to the applicant's ability to learn English.

The foreign individuals who sought the Foundation's services had some difficulty reading and writing English. At some point, Malik entered into a scheme with two physicians, Dr. Weiner and Dr. Vorasingha. For a fee, Malik sent his clients to Weiner or Vorasingha for "examinations" to determine if they qualified for a waiver. Weiner's examination consisted of talking with the applicant and also talking privately with Malik. Vorasingha's examination consisted of having one of his assistants ask some questions from a questionnaire that he had prepared for that purpose. Vorasingha diagnosed applicants based on their answers. Malik paid Weiner and Vorasingha between $70 and $120 for each examination.

After the examinations, Weiner and Vorasingha completed N-648s, stating that the applicants suffered from various maladies—including mental retardation, learning disorders, depression, anxiety, and post traumatic stress disorder—that impaired their ability to learn English. The evidence established that the factual information on which Weiner and Vorasingha based their diagnoses and conclusions was false and that the diagnoses and conclusions provided by Weiner and Vorasingha were erroneous and were not properly based on examinations of the applicants.

## III. LEGAL STANDARDS

### A. Rule 29 Motion for Acquittal

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992) (citing *United States v. Vastola*, 899 F.2d 211, 226 (3d Cir. 1990)). In considering a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, the trial court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations and internal quotation marks omitted). A finding of insufficiency of the evidence should "be confined to cases where the prosecution's failure is clear." *Id.* (quoting *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) [hereinafter *T. Smith*]). In reviewing a motion for judgment of acquittal, the court must "presume that the jury properly evaluated the credibility of witnesses, found the facts, and drew rational inferences" from the evidence. *United States v. Menon*, 24 F.3d 550, 564 (3d Cir. 1994); *see also United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (setting forth the standard for a post-verdict judgment of acquittal). The trial court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citing *United States v. Janotti*, 673 F.2d 578, 581 (3d Cir. 1982)). Accordingly, the jury verdict must be upheld, unless, viewing the evidence in this manner, no rational jury "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B. Rule 33 Motion for a New Trial

In considering a motion for a new trial under Federal Rule of Criminal Procedure 33, the trial court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). On a Rule 33 motion, "[t]he court may weigh the evidence, but may set aside the verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determines that an error at trial had a substantial influence on the verdict." *United States v. Enigwe*, No. 92-00257, 1992 WL 382325, at *4 (E.D. Pa. Dec. 9, 1992) (citations omitted), *aff'd*, 26 F.3d 124 (3d Cir. 1994). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). The court may exercise its discretion to grant a new trial based on the weight of the evidence "only if it finds that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Rich*, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (quoting *Johnson*, 302 F.3d at 150). A new trial is required on the basis of evidentiary errors only when the "errors, when combined, so infected the jury's deliberation that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993). Motions under Rule 33 "are to be granted sparingly and only in exceptional cases." *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

## IV. DISCUSSION

Weiner argues that the Government failed to prove the single conspiracy charged in the Indictment and that, consequently, there exists a variance between the single conspiracy as

charged and the proof at trial. Weiner also contends that the Government did not present

sufficient evidence to establish the existence of a conspiracy between him and Malik. In

addition, Weiner asserts that the Government's evidence was insufficient to support the jury's

verdicts on the substantive naturalization fraud counts on which the jury found him guilty.[3]

Weiner seeks relief under Rule 29 and Rule 33.

Malik did not address the variance issue in his motion and instead requested "the

opportunity to supplement [his] motion and provide a detailed memorandum of law . . . within a

reasonable amount of time after [receiving] the trial transcripts." (Doc. No. 104 ¶ 4.) Malik

subsequently joined in Weiner's Motion and in Weiner's Reply Memorandum, without providing

a detailed memorandum of law and without making any additional arguments on his own behalf.

(Doc. No. 117.) Vorasingha simply joined in Weiner's Motion. (*See* Doc. No. 108.) At the end

of the Government's case-in-chief, Vorasingha did "move for a motion to dismiss," arguing that

the Government failed to prove a conspiracy beyond a reasonable doubt. (Trial Tr. 165, July 16,

2009.) In making that oral motion, however, Vorasingha's counsel alluded only to the

conspiracy charge and did not mention the substantive naturalization fraud counts against

Vorasingha. (*Id.* at 165-67.)

Neither Malik nor Vorasingha submitted memoranda of law in support of their Motions.

The Local Criminal Rules unambiguously require that post-trial motions for judgment of

acquittal or new trial under Federal Rules of Civil Procedure 29 and 33 be supported by timely

filed memoranda. *See* L.C.R. 47.1. Even though Malik and Vorasingha submitted no

---

[3] I.e., Counts Two through Six and Eight through Ten. The jury found Weiner and Malik
not guilty on Count Seven.

memoranda of law in support of their motions, we will nevertheless consider their motions to the extent that they find support in Weiner's Memorandum of Law accompanying his Motion (Doc. No. 105) or in Weiner's Reply Memorandum (Doc. No. 116). We will consider Weiner's arguments to the extent they may apply to Malik's convictions on Counts One (conspiracy) and Two through Six and Eight through Ten (the substantive naturalization fraud counts on which the jury found Malik and Weiner guilty), and Vorasingha's conviction on Count One (conspiracy). We will not guess as to what Vorasingha's and Malik's additional arguments might have been.

### A. Sufficiency of Evidence to Support Substantive Counts of Naturalization Fraud

We turn first to Defendants' convictions on the naturalization fraud counts. Counts Two through Ten each charged Weiner and Malik with naturalization fraud in violation of 18 U.S.C. § 1425, and aiding and abetting in violation of 18 U.S.C. § 2. (Doc. No. 1.) Section 1425 states:

> (a) Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship; or
> (b) Whoever, whether for himself or another person not entitled thereto, knowingly issues, procures or obtains or applies for or otherwise attempts to procure or obtain naturalization, or citizenship, or a declaration of intention to become a citizen, or a certificate of arrival or any certificate or evidence of nationalization or citizenship, documentary or otherwise, or duplicates or copies of any of the foregoing--
> Shall be fined under this title or imprisoned . . . .

To prove naturalization fraud under § 1425, the Government had to show that: (1) Defendant procured or attempted to procure the naturalization of another person or documentary or other evidence of naturalization or citizenship; (2) Defendant did so contrary to law; and (3) Defendant knew that it was contrary to law to procure such naturalization. *See* 18 U.S.C. § 1425;

Trial Tr. 31, July 20, 2009 (Court's jury instructions on naturalization fraud). A defendant can

be found guilty of aiding and abetting naturalization fraud if the Government demonstrates that:

(1) each element of the crime charged was committed; (2) Defendant knew that the offenses

charged were going to be committed or were being committed; (3) Defendant did some act for

the purpose of aiding, assisting, facilitating, or encouraging the commission of the charged

offense, and with the intent that the offense be committed; and (4) Defendant's acts did in some

way aid or assist or facilitate or encourage others to commit the offense. *See* 18 U.S.C. § 2; Trial

Tr. 33-34, July 20, 2009 (Court's jury instructions on aiding and abetting).

Weiner contends that the Government failed to prove beyond a reasonable doubt the

falsity of his statements on the N-648 forms that he had completed.[4] (Doc. No. 105 at 7.)

Specifically, Weiner argues that the Government's evidence "rel[ied] on matters of medical

judgment" and "centered on the supposed discrepancy between the estimated prevalence of

mental retardation mentioned in the DSM-IV, and the prevalence of mental retardation as a

diagnosis in the N-648s that the Government located." (*Id.* at 7-8.) According to Weiner, "this

type of evidence . . . concerns the standards by which a physician reaches a diagnosis and thus

requires expert testimony." (*Id.* at 8.) In addition, Weiner argues that "[t]he Government

presented no evidence at all from which the jury could gauge the prevalence of mental retardation

_____

[4] As noted above, Vorasingha joined in Weiner's post-trial motion but provided no brief
or argument specific to his own case. (Doc. No. 108.) The Court has considered the arguments
advanced by Weiner concerning his conviction on Count One (conspiracy) to the extent that they
relate to Vorasingha. However, Vorasingha's joinder with respect to the naturalization fraud
counts is especially problematic because Weiner and Vorasingha are charged with separate
counts of naturalization fraud involving different evidence. We will not address the issue of the
sufficiency of the evidence to support Vorasingha's convictions on Counts Eleven and Twelve
(substantive counts of naturalization fraud ), since Vorasingha's counsel has not raised that issue.

in the relevant population." (*Id.*) Weiner also contends that the Government cannot claim that Weiner's examinations of the applicants were insufficient because that is a matter of medical judgment. (*Id.*) Finally, Weiner maintains that the Government "wished the jury to conclude that because the witnesses it presented did not appear disabled to a layperson, Dr. Weiner could not have concluded in good faith, between six and eight years ago, that they were." (*Id.* at 9.)

The Government responds that "the jury heard from witnesses who testified that they spoke English in front of [Weiner], yet, surprisingly, he stated on the form that they were unable to learn English or U.S. civics." (Doc. No. 109 at 12.) Moreover, "the jury also saw that Weiner's N-648 for these individuals was practically identical to every other N-648 that he completed: He diagnosed them with mental retardation, depression, anxiety, post-traumatic stress disorder, and learning disorder." (*Id.*) The Government argues that a number of the witnesses for whom Weiner prepared N-648s testified that when Malik told them to see Weiner, he asked them no questions with regard to their backgrounds. (Doc. No. 118 at 5-7.) Yet, Weiner included information in their respective N-648s about their experiences in their countries of origin that was false, and then used this false information as the basis for his medical diagnoses. (*Id.*) In addition, even though some of them (e.g., Nimer Fares and Khelifi) spoke at least a few words of English to Weiner, he indicated on their N-648s that they were unable to learn even basic English. (*Id.*) According to the Government, the jury "was free to conclude that Weiner, who was false in one, was false in all, particularly when all forms Weiner completed were practically identical, and each immigrant was brought to him by Malik."[5] (Doc. No. 109 at

---

[5] We agree with Weiner that the Government's brief improperly referred to the "false in one, false in all" doctrine. (Doc. No. 116 at 8.) That doctrine refers to a jury's evaluation of the credibility of a testifying witness in view of that witness's false testimony. *See Lambert v.*

12.)

After a thorough review of the evidence and testimony presented by the Government, we are satisfied that the evidence supports the jury's findings of naturalization fraud or attempted naturalization fraud as to both Weiner and Malik.  A brief review of the evidence and testimony offered in support of each naturalization fraud count is appropriate.

Count Three of the Indictment charged Weiner and Malik with committing naturalization fraud by making false statements on the N-648 form completed for Nimer Fares.[6]  Nimer first met Malik through his father, whom Malik had helped obtain U.S. citizenship.  (Trial Tr. 65, July 14, 2009.)  Nimer had previously applied for naturalization and taken the required citizenship test.  He passed the portion of the test dealing with U.S. history and government.  He failed the test of his English writing ability.  (*Id.* at 61-65; Gov't Exs. 2B & 2C.)  Nimer, along with his two brothers and a friend, approached Malik specifically for the purpose of seeking his help to obtain U.S. citizenship.  (Trial Tr. 66, July 14, 2009.)  According to Nimer, Malik presented himself as a lawyer and a doctor and told Nimer that he "could let [Nimer] go through very easy because [he] do[es] a lot of peoples [sic]."  (*Id.* at 66, 68.)  Malik charged Nimer between $1000

---

*Blackwell*, 387 F.3d 210, 256 (3d Cir. 2004) (noting that the common "falsus in uno, falsus in omnibus" jury instruction provides:  "If you find that any witness testified falsely about any material fact, you may disregard all of his testimony, or you may accept such parts of it as you wish to accept and exclude such parts of it as you wish to exclude").  The Government's argument applied that doctrine to Weiner's completion of N-648s, rather than his testimony.

[6] The names of some witnesses and other individuals involved in this case are spelled differently in the parties' submissions, the individuals' immigration forms, the spelling of their names stated during the trial, and the Verdict Form.  For consistency, the Court will utilize the same spelling as that used in the Verdict Form (Doc. No. 98).  In addition, Count Two of the Indictment alleges naturalization fraud based on the N-648 form completed for Adib Fares, a brother of Nimer Fares.  The names of their father and another brother also figured in trial testimony.  To avoid confusion, the Court will refer to the Fareses by their first names.

and $1200, asked for and obtained information about Nimer's family, and told Nimer that he would have to go to a doctor.  (*Id.* at 66-67.)  He did not explain the purpose of seeing a doctor. (*Id.*)  Nimer primarily spoke Arabic with Malik, but he also spoke some English both to him and in his presence during their interactions.  (*Id.* at 68-69.)

Not long after their initial meeting with Malik, Nimer, his brother, and his friend went to see a doctor, as directed by Malik.  (*Id.* at 71-72.)  They drove to Malik's house, picked up Malik, and went to the doctor's office.  (*Id.* at 72.)  At the doctor's office, they stayed in the waiting area while Malik went to speak alone with the doctor before calling them in.  (*Id.*) Nobody had yet explained to Nimer why he was going to see a doctor.  (*Id.*)  Before going in to see the doctor, Malik told Nimer and his companions that they should not speak to the doctor; the doctor would speak to Malik and Malik would speak to them in Arabic. (*Id.* at 73-74.) Eventually, Nimer went in to see the doctor, whom he identified at trial as Weiner.  (*Id.* at 73.) Nimer was with the doctor for about five to seven minutes.  (*Id.*)  Initially, Malik spoke to Weiner.  (*Id.* at 74.)  According to Nimer, Weiner then spoke to Nimer in English, asking his name "and a couple of things."  (*Id.*)  Nimer responded to Weiner in English.  (*Id.*)  Weiner asked where Nimer was from, but did not follow up on Nimer's response that he had been born in Jordan and had lived there.  (*Id.* at 75.)  Specifically, Nimer testified that Weiner did not ask him what the conditions were like in Jordan or about war or violence in Jordan.  (*Id.*)  Weiner did ask Nimer a few questions, such as the spelling of his name backwards, and "about the moons" and "about animals."  (*Id.* at 114.)  Weiner later testified that these questions were from standardized psychological tests.  (Trial Tr. 218-19, July 16, 2009.)  After spending five to seven minutes with Weiner, Nimer went back to the waiting room, while Malik stayed with Weiner for some

additional period of time.  (Trial Tr. 78, July 14, 2009.)

At trial, the Government introduced the N-648 form that Weiner filled out for Nimer.  (*Id.* at 78; Gov't Ex. 2F.)  On that N-648, Weiner stated that Nimer was a "26 [year old] male with Post-Traumatic Stress Disorder (DSM 309.81), Mental Retardation (DSM 319), learning disorder (DSM 315.9) and Anxiety (DSM 300)."  (Gov't Ex. 2F at 1.)  Weiner stated that "[b]ecause of his alienation during childhood, permanent refugee status from his larger family, and exposure to violence and fear for his sister and other relatives, he constantly worries about the future."  (*Id.*)  Weiner stated that Nimer was unable to learn English and U.S. history and civics because of those conditions.  (*Id.*)  Weiner further stated that Nimer's "developmental disability did manifest itself before age 22 because he was already traumatized, displaced distracted and anxious as a child," and that he "continues to have loved ones at risk."  (*Id.* at 2.)  Nimer testified at trial that he did not experience any war or oppression or violence when he lived in Jordan.  (Trial Tr. 76, July 14, 2009.)  In addition, he testified that not only was he not a refugee, but his remaining family in the Middle East were "far away from the fight" and he did not "have exposure to violence and fear for [his] sister."  (*Id.* at 87.)  Weiner stated on Nimer's N-648 that Nimer's problems—"immense distraction, poor concentration, and poor memorization"—were the consequences of Nimer's background, as referenced by Weiner in the N-648.  (Gov't Ex. 2F at 1.)  Nimer, however, denied that he suffered from "immense distraction, poor concentration, and poor memorization."  (Trial Tr. 87, July 14, 2009.)  Significantly, Nimer testified that Weiner never asked him about his personal or family background or about the conditions in his country of origin.  (*Id.* at 75-76.)

Count Two of the Indictment charged naturalization fraud as to Nimer's brother Adib,

who also testified at trial. Adib testified that he was born in Amman, Jordan, and grew up in a small city near Amman. (Trial Tr. 83, July 15, 2009.) Adib met Malik at Nimer's house for the purpose of getting Malik's help to obtain U.S. citizenship. (*Id.* at 92.) Malik told Adib that he would have to see a doctor who would prepare a report for him. (*Id.* at 94.) Adib testified that Malik did not explain to him why he would need a doctor's report. (*Id.* at 95.) Adib explained that when he sought Malik's help, he was aware of the existence of a medical waiver for the English language and U.S. history and civics requirements of the citizenship test because his father had received such a waiver. (*Id.* at 113-14.) He also testified that, at the time, he felt he could not pass the citizenship exam, and he understood that Malik would help him get a waiver and the purpose of their meeting with Weiner was to get that waiver. (*Id.* at 114-15, 118.) When he went to the doctor's office with Nimer and a friend, Adib and his companions waited outside while Malik went in first. (*Id.* at 97-98.) Adib then went in to meet the doctor, but he could not understand what Malik and the doctor talked about, as he did not speak English at the time. (*Id.* at 98.) Adib identified Weiner as the doctor. (*Id.* at 97.) Adib testified that he did not say anything to Weiner, who only spoke with Malik. (*Id.* at 98.) He also testified that Weiner did not perform any tests on him. (*Id.*) Adib spent approximately 20 to 25 minutes with Weiner and Malik. (*Id.* at 104.)

On Adib's N-648 form Weiner stated that Adib was a "29 y.o. single male with Post-Traumatic Stress Disorder (DSM 309.8), Depression (300.4), Anxiety (DSM 300), and Mental Retardation (DSM 319)." (Gov't Ex. 1E at 1.) Weiner further stated that Adib "was a refugee from Palestine who had to live in Jordan where his schooling (in Arabic) only went to the 7th grade." (*Id.*) Weiner continued that Adib "suffered from the pain, disappointment and worry

of daily violence, separation, abuse and bad news about his family in Palestine (uncles, aunts, cousins, friends) all his life and has the constant worry about the results for the future of these people." (*Id.*) According to Weiner, Adib consequently was "so distracted, he [could] not concentrate enough, in [Weiner's] medical opinion, to learn even basic words of English and/or U.S. history or civics." (*Id.*) Weiner also stated that Adib's "developmental disability of mental retardation did manifest itself before age 22, because this man was seriously affected by trauma, anxiety and depression even as a child refugee." (*Id.* at 2.)

Adib's testimony about his background sharply contrasted with the information Weiner included in Adib's N-648 form. Adib testified that he was not exposed to war or violence in Jordan, as there was no war in Jordan when he lived there. (Trial Tr. 85, 98, July 15, 2009.) Adib testified that he was neither a refugee from Palestine nor forced to live in Jordan, as Jordan was the country of his birth. (*Id.* at 101.) Adib finished high school in Jordan, having completed twelve grades in school—not seven. (*Id.* at 84, 101.) Adib also testified that he neither "suffered from the pain, disappointment and worry of daily violence, separation, abuse, and bad news about his family in Palestine all his life, [nor] ha[d] the constant worry about the results for the future of these people." (*Id.* at 102.) More importantly, however, Adib testified that he never told anyone such a thing and did not know how that information made it into his N-648. (*Id.*) Not having been a child refugee, Adib likewise could not explain how that information ended up in his N-648. (*Id.* at 103.) Additionally, Adib had not told Malik or Weiner that he had post-traumatic stress disorder, depression, anxiety, or mental retardation. (*Id.* at 100-01.) Adib testified that he told Malik that he could not read or write English, but did not provide Malik any information about his educational background or family history. (*Id.* at 119-21.) According to

Adib, he told Malik that he wanted his help with passing the citizenship test as soon as possible, and Malik did not ask him any questions. (*Id.* at 120-22.) Their interaction essentially consisted of Malik telling Adib to "sign here, come with me, give me money." (*Id.* at 119-20.)

Count Eight of the Indictment deals with Sofiene Khelifi, another applicant for whom Weiner completed an N-648 form and who testified at trial. Khelifi's encounter with Weiner was similar to those of Nimer and Adib Fares. Khelifi came to the United States in 1997 from Tunisia. (Trial Tr. 159, July 14, 2009.) In Tunisia, Khelifi had received a Bachelor's degree in math and physics, attended tourism school, and learned French and Italian in addition to his native Arabic. (*Id.* at 159-61.) Although he did not speak English when he arrived in the United States, Khelifi learned some English after several months as a result of interactions with customers at a pizza place at which he worked, from television, and from talking to people in general. (*Id.* at 163-64.) In 2002, Khelifi took a course at Orleans Technical Institute to be certified as an air conditioning technician. (*Id.* at 165.) When Khelifi decided to become a U.S. citizen, he looked into hiring a lawyer to help with the process, and a friend directed him to Malik. (*Id.* at 173-77.) During their interactions, Khelifi spoke to Malik only in Arabic. (*Id.* at 180.) Khelifi did not tell Malik, and Malik never asked, about other languages that Khelifi spoke, about his educational background, or about his work history. (*Id.* at 180.) Malik never asked about any medical conditions Khelifi may have had. (*Id.* at 180-81.) Malik charged Khelifi $1,000 and told Khelifi that he would have to see a doctor. (*Id.* at 178-79.) Khelifi's meeting with a doctor took place at Malik's house. (*Id.* at 181.) Khelifi identified Weiner as that doctor. (*Id.* at 182.) Khelifi testified that he was with Weiner for about 15 minutes, during which time Weiner asked him a few questions, including asking for his name and personal

information, such as his age. (*Id.* at 182-83.) He did not remember Weiner's other questions. (*Id.* at 183, 209.) Khelifi testified that Weiner performed no tests and they did not discuss anything other than the few questions. (*Id.* at 183.) Weiner did not ask Khelifi about his native language or other languages that he spoke, about his schooling, or about him coming to the United States. (*Id.* at 183.) During the meeting, Khelifi spoke to Weiner in English, but Malik also translated some of the questions when Khelifi could not understand them. (*Id.* at 181, 189, 214.) According to Khelifi, several other individuals were present at Malik's house when Khelifi met with Weiner. (*Id.* at 181.)

Khelifi's N-648, which Weiner completed, included information at odds with Khelifi's background. Weiner stated on the N-648 that Khelifi was a "28 yr. old man who suffer[ed] with mental retardation (DSM 319), anxiety disorder (308) and depression (300.4)." (Gov't Ex. 6B at 1.) According to Weiner's statements, "these conditions have a global effect on this man's abilities to think and reason. His memory is deficient." (*Id.*) Weiner also stated that Khelifi's "ability to process information is affected by these global defects and he becomes distracted and agitated if he tries to think or learn. He is not capable of reasoning and he is only capable of performing simple daily activities." (*Id.*) Weiner concluded that, in his professional opinion, Khelifi was "incapable of learning a new language (even basic words of a new language) or U.S. history and civics because of his mental impairment." (*Id.*) Weiner further opined that Khelifi's "developmental disability first manifested itself before age 22," basing that conclusion on the assertion that "as a child in Tunisia he saw poverty, displacement and violence." (*Id.* at 2.)

In response to the prosecutor's questioning, however, Khelifi testified that he did not have any problems thinking or reasoning at the time of his meeting with Weiner, and that his memory

was not deficient.  (Trial Tr. 187, July 14, 2009.)  He testified that it was not true that he "bec[a]me distracted and agitated and that it was difficult for [him] to think or learn."  (*Id.* at 187-88.)  Khelifi further testified that he did not "have any difficulty performing simple daily activities," and that around the time of his meeting with Weiner, his job consisted of repairing, installing, and fixing air conditioning systems on a daily basis, and interacting with customers in English.  (*Id.* at 188.)  Shortly before meeting with Weiner, Khelifi had obtained his certification from Orleans Technical Institute.  (*Id.*)  Khelifi stated that he did not have difficulty learning English, thinking, or reasoning, and, in fact, spoke to Weiner in English during their meeting. (*Id.* at 181, 189.)  Khelifi also testified that there was no war, oppression, or violence in Tunisia. (*Id.* at 192.)  At some point Khelifi met with Malik's daughter, who practiced with him, in English, asking questions similar to those on the citizenship test.  (*Id.* at 195.)  Ultimately, Malik told Khelifi to go ahead and take the citizenship test because his English was good enough.  (*Id.* at 195-96.)  Khelifi took the test and passed it.  (*Id.* at 196.)

Count Nine charged naturalization fraud as to Mershad Haj.  Haj testified that he went to the doctor with Malik and that Malik met with the doctor alone before calling him in.  (Trial Tr. 309-10, July 14, 2009.)  He testified that he answered at least a few of Weiner's questions in English.  (*Id.* at 311.)  Weiner asked Haj whether there was fighting in the town he was from, and he responded that there was not and that it was peaceful there.  (*Id.* at 311-12.)  Haj's N-648 shows that Weiner diagnosed him with learning disorder, depression, anxiety, PTSD, and mental retardation.  (Gov't Ex. 7A at 1.)  Contrary to what Haj had told Weiner about the town he was from, Weiner attributed his diagnosis, in part, to Haj's childhood exposure to "violence, poverty, and disruption/displacement" in the West Bank of Palestine.  (*Id.* at 2.)

Count Six deals with Besam Awawdeh, who testified that a friend brought him to Malik because he wanted to apply for citizenship but could not read or write English. (Trial Tr. 233-34, July 15, 2009.) Malik took him to see Weiner. (*Id.* at 238-39.) Malik went in first and some time later called Awawdeh in. (*Id.* at 239.) Awawdeh testified that he was with Malik and Weiner for approximately 10 to 15 minutes. (*Id.* at 239.) Weiner greeted Awawdeh and asked him how he was doing, which was the extent of their interaction. (*Id.*) Awawdeh testified that he had not told Malik anything about his mental health. (*Id.* at 251.) In Awawdeh's N-648, Weiner described conditions that Awawdeh experienced growing up in the West Bank of Palestine. (Gov't Ex. 5B at 1.) Weiner stated that Awawdeh "was unable to attend any school regularly because of violence and poverty" and had "fear of injury or death to his family still in Palestine." (*Id.*) Weiner diagnosed him with mental retardation, learning disorder, depression, and PTSD. (*Id.*) Again, Weiner's statements on the N-648 about Awawdeh's background were contradicted at trial by Awawdeh at trial. (Trial Tr. 242-43, July 15, 2009.) At trial, Awawdeh testified that he had never related these things to Weiner. (*Id.* at 239, 262-63.)

Count Five pertains to Wesal Ahmad. Ahmad testified that she had failed the English writing and speaking portion of the citizenship test the first two times she took it, and someone told her husband that Malik helped people obtain citizenship. (*Id.* at 208-09.) When she met with the doctor, she did not speak with him; only Malik did, for about 10 minutes. (*Id.* at 212.) Weiner's N-648 for Ahmad diagnosed her with mental retardation, learning disorder, depression, and PTSD. (Gov't Ex. 4D.) Weiner attributed his diagnoses, in part, to Ahmad's "expos[ure] to horrific violence, poverty and displacement on a daily basis," even though she testified that she did not learn English because she had many young children who took up all her free time and that

she had told Malik nothing about her health or about her background.  (*Id.*; Trial Tr. 213-15, July 15, 2009.)

Count Four deals with Rehab Hoshan.  Hoshan testified that she had no time to take English classes when she came to the United States because she was busy raising her seven children.  (Trial Tr. 65-66, July 15, 2009.)  She heard in the community that Malik could help her "pass the test," after she had previously failed the citizenship test on more than one occasion. (*Id.* at 65-69.)  Malik dealt with Hoshan's husband or her cousin.  (*Id.* at 69.)  She did not meet him.  (*Id.*)  Hoshan testified that she went to the doctor and was with him for about 15 minutes, but she did not remember the details of that visit.  (*Id.* at 70-73.)  Hoshan's N-648, completed by Weiner, contained diagnoses of mental retardation, learning disorder, PTSD, anxiety, and depression.  (Gov't Ex. 3F at 1.)  Weiner attributed his diagnoses, in part, to Hoshan being "distracted by vivid thoughts of hatred and violence both in her past and in the present day Palestine."  (*Id.*)  Weiner also stated that Hoshan's "education only went as far as the 6th grade because of closings, fear, strikes, hunger, and poverty."  (*Id.*)  In another portion of the N-648, Weiner stated that Hoshan "stopped her education in the 6th grade, because she was exposed to violence, disruption of her family safety, intimidation and fear even as a child every day."  (*Id.* at 2.)  Weiner concluded that, in his medical opinion, these conditions left Hoshan "incapable of learning even basic English, history, or civics."  (*Id.* at 1.)  Hoshan, however, testified that she left school in sixth grade because her father unable to support school tuition for all twelve of his children.  (Trial Tr. 59-60, July 15, 2009.)  Once she came to the United States, she did not have

time to take English classes, because she had to care for her seven children.[7]  (*Id.* at 66.)  Hoshan

testified that she finally learned English through taking care of her children, taking them to

school and to doctors, going shopping, and other such activities, around the time "when the kids

grow [sic] up and they start to go to school and stuff."  (*Id.* at 64-65.)

The jury also returned a guilty verdict as to Malik and Wiener on Count Ten, pertaining

to the N-648 form of Fatna Sanad.  The Government's proof for Count Ten differed from that for

the other counts, in that the Government did not produce a copy of Sanad's N-648 form and she

did not testify at trial.  Weiner claims that, as a result, the jury "could [not] have concluded,

properly or otherwise, that Dr. Weiner's statements as to Fatna Sanad, Count Ten, were false."

(Doc. No. 105 at 10.)  Weiner, however, testified about the N-648 he completed for Sanad.

Weiner testified that she was the last applicant for whom he completed an N-648 before ceasing

his work with Malik.  (Trial Tr. 240-44, July 16, 2009.)  The defense also introduced into

evidence Weiner's letter to the Immigration and Naturalization Service (INS), dated August 3,

2003, about Weiner's evaluation of Sanad, in which Weiner summarized the diagnoses of (not

surprisingly) mental retardation, learning disorder, depression, and PTSD in Sanad's N-648.  (*Id.*

at 244; Ex. DW-6.)  This letter was written after INS took issue with Weiner's N-648 for Sanad.

A jury could reasonably infer that when Weiner found out that INS was investigating the N-648s

that he had completed for Malik, he attempted to cover up his tracks by writing to INS to justify

---

[7] While Hoshan testified that she thinks about Palestine and her family (*id.* at 77-78), it was unclear from her testimony on direct examination if she was referring to negative thoughts or experiences, or to life in Palestine in general.  She did testify that "life [was] very hard there." (*Id.* at 59-60.)  The logical inference from that testimony was that she was alluding to her father being unable to afford schooling for all his children.  Hoshan was not cross-examined, leaving this aspect of her testimony unclear.

his actions.  At this point, Weiner had already completed approximately 130 N-648 forms for

Malik.  Moreover, Weiner saw four more applicants brought to him by Malik on August 24,

2003—the day after he wrote the letter to INS.  (Ex. DW-7.)  Based upon all of the evidence, the

jury could have reasonably concluded that Weiner had intentionally included false information in

the N-648 he completed for Sanad.

The totality of the evidence in this case was more than sufficient to support the jury's

conclusion that Weiner and Malik committed naturalization fraud on Counts Two through Six

and Eight through Ten.

### B.    Materiality of the Evidence of Naturalization Fraud

Weiner also argues that the Government failed to prove the materiality of Weiner's false

statements on the N-648s that he had completed.  (Doc. No. 105 at 10.)  Weiner contends that

Gail Burroughs, an immigration services officer with the United States Citizenship and

Immigration Services (CIS), testified that when an N-648 is completed more than six months

before the filing of an N-400 form, "CIS would not even consider the content of the N-648."

(*Id.*)  Accordingly, Weiner argues that "under no theory of materiality could the information in

[various N-648 forms] have led to the discovery of additional information" because the N-648

form was completed more than six months before the filing of the N-400 form.  (*Id.*)  The

Government responds that Weiner's materiality argument fails because he "plainly ignores that

he was also charged with 'attempt' to commit naturalization fraud."  (Doc. No. 109 at 13.)  The

Government argues that "[i]t is irrelevant that the forms may have been outdated by the time the

applicants appeared for their interviews," since "[t]he evidence proved beyond a reasonable

doubt that Weiner attempted to commit naturalization fraud by lying on the forms."  (*Id.*)

We agree with the Government that Weiner has overlooked the "attempt" element of the naturalization fraud counts. *See* 18 U.S.C. § 1425(a) (criminalizing the act of attempting to unlawfully procure naturalization to the same extent as the unlawful procurement of naturalization). Whether the false statements ultimately resulted in the applicants obtaining naturalization is indeed irrelevant. The intent and the substantial steps of Defendants are the issue, not the success of their actions.

### C.  Existence of a Variance

We next turn to Weiner's argument that the Government failed to prove the single conspiracy charged in the Indictment. "[A] conviction must be vacated where a variance between the indictment and proof at trial exists to the prejudice of a defendant's substantial rights." *United States v. Salmon*, 944 F.2d 1106, 1116 (3d Cir. 1991) (citing *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)). "Where a single conspiracy has been alleged [in the indictment], a variance of proof occurs if the evidence shows merely multiple conspiracies." *Id.* "The variance doctrine is designed to protect a defendant's right 'not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 775 (1946)). The doctrine recognizes that in certain instances, a "jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another." *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982).

The determination "of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002). The task before the court is to determine whether, reviewing the evidence in a light most favorable to

the Government, a reasonable jury could find that a single conspiracy existed as charged.  *See Salmon*, 944 F.2d at 1116; *Kelly*, 892 F.2d at 258.  The Third Circuit has articulated three factors that are indicative of the existence of a single conspiracy:  (1) "whether there was a common goal among the conspirators;" (2) whether the "nature of the scheme" was such that "the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators;" and (3) the "extent to which the participants overlap in the various dealings."  *Salmon*, 944 F.2d at 1116 (citing *Kelly*, 892 F.2d at 259).  A court should consider all three factors, as "the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy."  *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

### 1.  *Common Goal Among Malik, Weiner, and Vorasingha*

The Government argues that "[t]he common goal in this case was to allow immigrants to obtain citizenship by avoiding basic naturalization requirements."  (Doc. No. 109 at 5.)  According to the Government, "[i]t was perfectly reasonable for the jury to conclude that, in order for this business to thrive and survive, Malik would need the help of many individuals, including many doctors."  (*Id.* at 7.)  Weiner responds that there was no common goal because "[t]he record contains no evidence that either of the doctors in this case knew that Malik's organization was larger than the doctor's own role in it."  (Doc. No. 105 at 3.)

We agree with Weiner.  "A criminal agreement is defined by the scope of the commitment of its co-conspirators."  *United States v. Smith*, 82 F.3d 1261, 1270 (3d Cir. 1996) [hereinafter *J.D. Smith*] (citation omitted).  Thus, "where a defendant is unaware of the overall objective of an alleged conspiracy or lacks any interest in, and therefore any commitment to, that objective, he is not a member of the conspiracy."  *Id.*  In *Kotteakos*, the indictment alleged a

single conspiracy to obtain loans from the FHA using fraudulent information.  328 U.S. at 752.

The evidence, however, showed that a single individual, Brown, was at the "hub" of the scheme,

assisting in the preparation of each loan application, whereas the other individuals in each loan

transaction were only interested in the success of their own loan applications:

> Except for Brown, the common figure, no conspirator was interested in whether any
> loan except his own went through.  And none aided in any way, by agreement or
> otherwise, in procuring another's loan.  The conspiracies therefore were distinct and
> disconnected, not parts of a larger general scheme, both in the phase of agreement
> with Brown and also in the absence of any aid given to others as well as in specific
> object and result.  There was no drawing of all together in a single, over-all,
> comprehensive plan.

*Blumenthal v. United States*, 332 U.S. 539, 558 (1947) (describing the facts of *Kotteakos*).  The

Court in *Kotteakos* concluded that "[t]he jury could not possibly have found, upon the evidence,

that there was only one conspiracy."  328 U.S. at 768.

In contrast, in *Blumenthal* the Court found that the evidence showed a single conspiracy

to market whiskey at prices above the legal ceiling price in a manner that would appear lawful.

Even though some of the multiple participants in the scheme were unaware of the identity or role

of other participants, all were committed to a single, common objective:

> All knew of and joined in the overriding scheme.  All intended to aid the owner . . .
> to sell the whiskey unlawfully, though the two groups of defendants differed on the
> proof in knowledge and belief concerning the owner's identity.  All by reason of their
> knowledge of the plan's general scope, if not its exact limits, sought a common end,
> to aid in disposing of the whiskey.  True, each salesman aided in selling only his part.
> But he knew the lot to be sold was larger and thus that he was aiding in a larger plan.
> He thus became a party to it . . . .

*Blumenthal*, 332 U.S. at 559.

Following *Kotteakos* and *Blumenthal*, the Third Circuit has "drawn a distinction between

multiple and single conspiracies based upon the existence of a commitment to a single set of

objectives." *See J.D. Smith*, 82 F.3d at 1270 (citing cases). There must be some interdependence among the members of a single conspiracy so that each member depends upon, is aided by, or has an interest in the success of the others. *United States v. Kemp*, 500 F.3d 257, 289-90 (3d Cir. 2007), *cert. denied*, 128 S. Ct. 1329 (2008); *see also J.D. Smith*, 82 F.3d at 1271 (finding that single conspiracy did not exist because of "[t]he lack of common activities or interdependence"). In *Kemp*, the defendants were officials of the City of Philadelphia who were convicted of a variety of corruption charges, including a single conspiracy charge. *Id.* at 264. Two of the defendants challenged their conspiracy convictions on the grounds that the government had charged a "hub-and-spokes" conspiracy but failed to prove the existence of a rim connecting the spokes, similar to the situation in *Kotteakos*. *Id.* at 287-88. They argued that city officials, who were the hub, entered into separate agreements with the defendants, who acted as the unconnected spokes. *Id.* at 288. The Third Circuit agreed, finding that the evidence at trial proved only the existence of multiple separate conspiracies, not the single conspiracy that was charged.[8] *Id.* at 288-91. The court observed that "there was an insufficient degree of interdependence between [several of the co-conspirators]," which made it "difficult to conceive" how their activities "were interdependent or mutually supportive" to support a single conspiracy charge among them. *Id.* at 290. The court found no evidence that the defendants "should have known that the conspiracy involved parts beyond [two other defendants]," notwithstanding the fact that the indictment charged multiple other defendants with the single conspiracy. *Id.* at 289.

A recent case from the Tenth Circuit is consistent with this Third Circuit authority. In

---

[8] We note that even though the Third Circuit found a variance in *Kemp*, the court concluded that the variance was not prejudicial and the convictions were affirmed. 500 F.3d at 291-92. We reach the same conclusion here. *See* Section IV.C.4, *infra*.

25

*United States v. Carnagie*, the defendants were charged with, *inter alia*, conspiracy to defraud the United States in violation of 18 U.S.C. § 371 for allegedly providing false loan documentation to persons with bad credit to help them obtain a home loan insured by the FHA. 533 F.3d 1231, 1234 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1366 (2009). Significantly, the Tenth Circuit distinguished drug conspiracies from the financial conspiracy at issue, reasoning that there is a higher standard for proving interdependence in financial conspiracies:

> [T]here is a difference in the proof necessary to establish interdependence in a drug conspiracy from that necessary to link parallel financial transactions . . . . [B]ecause the manufacture, sale, and use of drugs is illegal, essentially every aspect of the drug distribution business is illegal. Each participant is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture . . . .
>
> In contrast, selling real estate and obtaining loans for those sales is generally lawful. Unlawful activity, however, may occur as part of those otherwise lawful transactions . . . . In this situation, because the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy. Instead, interdependence must be proved more precisely. The government must do more than prove that a defendant participated in a real estate transaction involving false documentation to demonstrate interdependence; *it must show that each defendant's actions benefitted the common venture.*

*Id.* at 1239 n.5 (emphasis added). The court found a fatal variance because the government failed to prove that each defendant's actions benefitted the common venture. *Id.* at 1239. The instant case does not involve a financial transaction per se, but it does involve a transaction—the naturalization process—that is generally lawful. Accordingly, one cannot "infer an illegal common purpose" in this case "in the same way that a common purpose could be found in a drug conspiracy." *Id.* at 1239 n.5. As in *Carnagie*, each defendant's actions here must have "benefitted the common venture." *Id.*; *Kemp*, 500 F.3d at 289 (noting that "interdependence serves as evidence of an agreement" and "helps establish whether the alleged coconspirators are

all committed to the same set of objectives in a single conspiracy" (citation omitted)).

The evidence presented at trial, viewed in the light most favorable to the Government, does not support the finding of a common goal or purpose. Weiner and Vorasingha completed no medical examinations together. (Trial Tr. 154, 211, 257-58, July 16, 2009.) Weiner did not know and had never heard of or met Vorasingha, and there was no evidence that Vorasingha knew or had ever met Weiner. (*Id.* at 314.) While one need not know the identities of the co-conspirators to be convicted of conspiracy, the Government must show a "unity of purpose [between the alleged conspirators], the intent to achieve a common goal, and an agreement to work together toward that goal." *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998) (citation omitted). There was no evidence of a unity of purpose here. Weiner completed N-648 forms with Malik from 2001 to 2003. (Trial Tr. 211, 257-58, July 16, 2009.) Weiner wrote a letter to Malik terminating his involvement on September 18, 2003. (*Id.* at 249, 256-57.) Weiner did not complete any N-648 forms for Malik after that date. (*Id.* at 258.) Vorasingha did not begin to complete N-648 forms with Malik until 2005, more than a year after Weiner terminated his relationship with Malik. (*Id.* at 154.) There can be no "unity of purpose" between Weiner and Vorasingha where they completed medical examinations during mutually-exclusive time frames and where those evaluations were entirely discrete events without any connection to each other, other than the involvement of Malik.

At the suppression hearing in this case, the Government argued that "it was foreseeable to Dr. Weiner that . . . other doctors were involved." (Suppression Hr'g Tr. 13, Apr. 13, 2009.) The Government makes that argument again now. (*See* Doc. No. 109 at 7-8 n.3 ("It was perfectly reasonable for the jury to conclude that Weiner must have known that an operation so

seemingly professional would utilize more than one doctor.  Not only would it be necessary to maintain the operation's volume of business, but it would be necessary to help avoid suspicion.").)  According to the Government, Burroughs "testified that immigration officers ultimately grew suspicious of applications based on the similarities of certain doctors and 'diagnoses' of applicants associated with Malik."  (*Id.*)  The Government does not cite to the specific portion of Burroughs's testimony on which it relies for this proposition.

Burroughs did not testify that immigration officers ultimately grew suspicious of applications based on similarities of diagnoses associated with Malik.  She testified that Malik came in with applicants for citizenship and that 90% of those applicants had a medical waiver. (Trial Tr. 37, July 15, 2009.)  Burroughs noticed during her interviews of the applicants that "the medical condition stated by the physician did not always seem to relate to the person who was before [her]."  (*Id.* at 38.)  The observation of an incongruity between the diagnosis and the person before her does not mean that Burroughs observed similar diagnoses across applicants.  It does not suggest that she was suspicious of such similarities.  Moreover, there was no evidence presented at trial to support an inference that Malik's reliance on a single doctor would raise suspicions among the immigration authorities.

The Government argues that "[t]here has been plenty of evidence" that Weiner knew that Malik operated "an ongoing business to assist people in immigration or naturalization."  (Trial Tr. 167, July 16, 2009.)  The evidence does show, and Weiner does not dispute, that he knew that Malik had an ongoing business assisting applicants with the naturalization process.  But the Government presented no evidence that Weiner knew that Malik continued the unlawful aspect of his business after Weiner stopped completing N-648 forms for Malik.  Malik's business, at

least on its face, was a lawful venture. The fact that he had a business does not mean that Malik continued to operate it illegally. Malik's continuation of his business after Weiner's withdrawal did not imply the inherent commission of naturalization fraud. *See Carnagie*, 533 F.3d at 1239 n.5 (contrasting the illegal nature of a drug distribution business, in which "[e]ach participant is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture," with the legal nature of a real estate business, in which unlawful activity simply "may occur as part of those otherwise lawful transactions"). The Government did not present any evidence that would lead one to conclude that each doctor knew that Malik was also working with other doctors to commit naturalization fraud.

Weiner and Vorasingha are similar to the defendants in *Carnagie*, who were charged with conspiracy to defraud the United States in a real estate scheme. Many of the defendants in *Carnagie* "did not know the identity of the other real estate agents and loan officers involved in their scheme." *Id.* at 1234-35. One of the groups of co-conspirators "was completely dissolved" by the time another group formed. *Id.* at 1240. The transactions from one group of co-conspirators "in no way benefitted from or depended upon the success of [a later group's] transactions, and vice versa." *Id.* "The different groups engaged in similar transactions for similar reasons, but there was no showing of mutual dependence between them" and the court found no mutual dependence. *Id.* Here, the relationship between Weiner and Malik was completely dissolved by the time Vorasingha met Malik. Weiner and Vorasingha did not know the identity of each other or of anyone else involved in Malik's scheme. Transactions between Weiner and Malik in no way benefitted from or depended on the transactions between Vorasingha and Malik, and vice versa. *See Kemp*, 500 F.3d at 289 ("In evaluating

interdependence, we consider how helpful one individual's contribution is to another's goals."). We are satisfied that the evidence does not establish that Malik, Weiner, and Vorasingha shared a common goal.

### 2. Continuous Result Requiring Continuous Cooperation

In evaluating whether a reasonable jury could find that a single conspiracy existed as charged, we must also consider "'the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result'" that was unable to continue "'without the continuous cooperation of the conspirators.'" *Salmon*, 944 F.2d at 1116 (quoting *Kelly*, 892 F.2d at 259). The Government argues that "the agreement sought to bring about a continuous result, i.e., the unlawful naturalization of immigrant-applicants." (Doc. No. 109 at 5.) To determine whether the nature of the scheme indicates a single conspiracy, we look to any evidence that "the activities of one group . . . were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007) (internal citations and quotations marks omitted).

The success or failure of Malik and Weiner in obtaining exemptions from the citizenship test for certain applicants had no bearing on the success or failure of Malik and Vorasingha in doing the same for other applicants. The reverse holds true as well. As Weiner noted, "[t]here is simply no basis in the record for concluding that Dr. Weiner's completing N-648s for a completely separate group of applicants assisted the success of Dr. Vorasingha's N-648s, nor vice versa." (Doc. No. 105 at 4-5.) We also agree that "the temporal disconnect between Dr. Weiner's involvement and Dr. Vorasingha's logically negates any possibility that either doctor's actions aided the other's." (*Id.* at 5.) *See United States v. Rigas*, 584 F.3d 594, 612 (3d Cir.

2009) (noting that an evaluation of this factor of the variance test requires a court to "consider whether all aspects of the scheme were interdependent").  There was no evidence presented that would support an inference that Weiner's success affected Vorasingha's success more than a year later or that Vorasingha's success somehow affected Weiner's.  There was no continuous result based upon continuous cooperation.

### 3.    *Extent to which Malik, Weiner, and Vorasingha Overlap*

Finally, there was very little overlap between Weiner and Vorasingha.  As mentioned above, Weiner and Vorasingha completed no medical examinations or N-648 forms together.  Weiner and Vorasingha had never met or even heard of one another.  (Trial Tr. 314, July 16, 2009.)  Weiner's and Vorasingha's activities as part of Malik's scheme also did not overlap in time.  The only overlap between Weiner's and Vorasingha's activities was that both doctors dealt with Malik.

The Government's evidence in this case established that there were two separate conspiracies here, not one.  Malik conspired with Weiner.  And Malik conspired with Vorasingha.  There was no common goal between the three Defendants, and their activities were not interdependent.  There was no cooperation between Defendants, much less continuous cooperation leading to a continuous result, and there was no overlap.  Clearly, there was a variance between the crime charged in Count One of the Indictment and the proof at trial.

### 4.    *Prejudice*

Even if there exists a variance between the indictment and the proof at trial, the variance is not fatal to a conviction unless it prejudices the defendant's substantial rights.  *United States v. Padilla*, 982 F.2d 110, 114-16 (3d Cir. 1992); *see also Kemp*, 500 F.3d at 291 ("We will only

vacate [the defendant's] convictions, however, if they can show that the variance prejudiced their substantial rights."). "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [and] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." *United States v. Schoenhut*, 576 F.2d 1010, 1021-22 (3d Cir. 1978); *accord United States v. Duronio*, No. 02-0933, 2006 WL 3591259, at *10 (D.N.J. Dec. 11, 2006), *aff'd*, 2009 WL 294377 (3d Cir. Feb. 9, 2009), *cert. denied*, 2009 WL 3007793 (Oct. 20, 2009). Such prejudice most often arises by the "spillover" effect of evidence of one defendant's guilt to another defendant who was not involved in the same conspiracy. *See Kotteakos*, 328 U.S. at 774 (warning of "[t]he dangers for transference of guilt from one to another across the line separating conspiracies"). Notwithstanding the fact that we have found that a variance exists between the evidence adduced at trial and the Indictment, we are satisfied that the variance did not prejudice Defendants' substantial rights.

The Indictment sufficiently informed Weiner and Vorasingha of the conspiracy charge against them. In a Memorandum disposing of Malik's motion to dismiss Count One of the Indictment, we discussed the nature of the conspiracy charge against Defendants as follows:

> [Count One] alleges that the three Defendants "conspired and agreed" to commit an offense against the United States. It identifies the specific offense as the unlawful procurement of naturalization in violation of 18 U.S.C. § 1425. The means by which [Malik] committed the offense are also identified: [Malik] is alleged to have carried out the offense by bringing the foreign individuals to Weiner and Vorasingha, who then falsified the waiver forms. [Malik] is further alleged to have "subsequently assisted the applicants in preparing the Form N-400, which included the representations that the applicants could not speak English, which [Malik] submitted to the INS on the foreign applicants' behalf."

These allegations permit [Malik] "to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." [Malik] is "sufficiently apprised of what he must be prepared to meet." Count One contains the elements of the offense, the underlying factual circumstances, and citations to the relevant law. Hence, Count One sufficiently alleges a single conspiracy to commit naturalization fraud.

*United States v. Malik*, No. 08-0614, 2009 WL 1922257, at *5 (E.D. Pa. July 2, 2009) (internal citations omitted). We issued a similar Memorandum with respect to Weiner. *See United States v. Weiner*, No. 08-0614, 2009 WL 1911286, at *3 (E.D. Pa. July 1, 2009). The same analysis holds true for Vorasingha. The Indictment sufficiently informed Defendants of the charges against them and the underlying facts, so that they could "prepare [their] defense and not be misled or surprised at trial." *Schoenhut*, 576 F.2d at 1021-22; *see also Kemp*, 500 F.3d at 291 ("[T]he 'notice' purpose has not been violated because [the defendants] were aware from the indictment as to their role in the conspiracy, even if this conspiracy had been solely between them and the . . . hub [of the conspiracy].").

With regard to the possibility of evidentiary spillover, there was little chance of that in this case. The Government presented evidence directly implicating Weiner in Malik's scheme and directly implicating Vorasingha in a separate scheme with Malik. Weiner's conduct was discrete and had ended by 2003. Vorasingha's conduct was likewise discrete and took place only in 2005. The jury was instructed to compartmentalize the evidence. The jury would have had little difficulty in doing so, especially in view of the time period separating Weiner's conduct from Vorasingha's conduct. *Cf. Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (alluding to "the almost invariable assumption of the law that jurors follow their instructions, which we have applied in many varying contexts" (citation omitted)).

33

Addressing next the issue of whether the variance is such that it will present a danger that the defendant may be prosecuted a second time for the same offense, we note that a "variance between the indictment and the evidence at trial becomes impermissible if it broadens the basis for conviction beyond the elements of the crime alleged; it is permissible, however, if it narrows the scope of the evidence to prove an offense included in the indictment, and if the narrowing of the charge does not prejudice the defendant." *United States v. Dwyer*, No. 03-0155, 2005 WL 1364839, at *6 (D.N.J. June 9, 2005) (citing *United States v. Castro*, 776 F.2d 1118, 1122-23 (3d Cir. 1985)); *see also United States v. Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005) ("'A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment.'" (quoting *United States v. Harrison*, 942 F.2d 751, 758 (10th Cir.1991))). *Cf. United States v. Perrone*, No. 05-0774, 2007 WL 43998, at *3 (S.D.N.Y. Jan. 4, 2007) (noting that the doctrines of variance and constructive amendment "apply only where the proof at trial is broader than the indictment, not where it is narrower" (citing *United States v. Miller*, 471 U.S. 130, 136 (1985))).

We fail to see how the variance here created a risk that any Defendant could be prosecuted a second time for the same offense. The evidence at trial did not broaden the basis for conviction beyond the alleged single conspiracy. Rather, instead of proving a broad overarching agreement between Defendants, it proved the existence of two narrower agreements, one between Malik and Weiner and one between Malik and Vorasingha. This was not the conspiracy charged in the Indictment, but it was based upon the same facts. None of the Defendants was prejudiced by the narrowing of the conspiracy charged in the Indictment. *See United States v. Schurr*, 775

F.2d 549, 555 (3d Cir. 1985) (finding that defendants "demonstrated neither prejudice nor a material variance" because "any variance between the broad conspiracy outlined in the indictment and the narrow conspiracy proved at trial did not result in [the defendants] being convicted based on the conduct of other individuals," defendants had "fair notice, given the content of the indictment, [of the] primary focus of the evidence at trial" and "were not surprised by the proof offered at trial," and the "overbroad indictment in no way threatens the defendants with future prosecutions for the same offense"); *United States v. Wozniak*, 781 F.2d 95, 97 (7th Cir. 1985) ("So long as the indictment gives notice of the crime charged, the prosecutor may narrow its scope at trial."). This variance presents no danger that any of the Defendants could be prosecuted a second time for the same offense. *See Miller*, 471 U.S. at 135 ("The indictment was also sufficient to allow [the defendant] to plead it in the future as a bar to subsequent prosecutions.").

Accordingly, while there was a variance between Count One of the Indictment and the evidence adduced at trial, Defendants have failed to demonstrate that they were prejudiced by the variance. The variance therefore does not provide a basis to overturn their convictions.

> **D.** **Sufficiency of Evidence to Support Conspiracies Between Malik and Weiner and Between Malik and Vorasingha**

Weiner also argues that "the evidence [was not] sufficient to establish that Dr. Weiner conspired with Habeeb Malik for the illegal purpose of naturalization fraud." (Doc. No. 105 at 6.) Weiner specifically claims that the only evidence of an illegal agreement "is evidence that, in the government's view, Dr. Weiner made false statements on the N-648s." (*Id.*) According to Weiner, "in the majority of cases in which Dr. Weiner completed N-648s, Dr. Malik either did

not submit them to CIS, or submitted them too late to be of use," which belies a "concerted criminal action" between Weiner and Malik.  (*Id.* at 7 (footnote omitted).)

Count One charges conspiracy in violation of 18 U.S.C § 371.  (Doc. No. 1 ¶ 7.)  To sustain the conviction for conspiracy, the record must contain sufficient evidence of:  "1) the existence of an agreement, 2) an overt act by one of the conspirators in furtherance of the objective, and 3) an intent on the part of the conspirators to agree as well as to defraud [or to commit an offence against] the United States."  *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989); *see also* 18 U.S.C. § 371.  To "defraud" the United States refers not only to cheating the government out of property or money, but "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."  *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).  Because of the nature of the crime of conspiracy, proof that the objective of the conspiracy has been completed is not required.  *See United States v. Conley*, 37 F.3d 970, 981 n.15 (3d Cir. 1994) (observing that "the government may allege and prove conspiracy even if the underlying substantive object of the conspiracy is never completed").

The Third Circuit has observed that "[t]he elements of a conspiracy . . . can be proven entirely by circumstantial evidence.  Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence."  *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir.2005) (internal citations and quotation marks omitted).  Thus, the existence of a conspiracy may be inferred from evidence of related facts and circumstances. However, on a Rule 29 motion, a court must review the sufficiency of Government's evidence

with special care, for a "[c]onspiracy cannot be proven 'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." *Id.* (quoting *Coleman*, 811 F.2d at 808); *see also Coleman*, 811 F.2d at 807 ("[T]he sufficiency of the evidence in a conspiracy prosecution requires close scrutiny." (quoting *United States v. Cortwright*, 528 F.2d 168, 171 (7th Cir. 1975))). At the same time, "[t]o sustain a conspiracy conviction, the 'contention that the evidence also permits a less sinister conclusion is immaterial. To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt.'" *T. Smith*, 294 F.3d at 478 (quoting *Dent*, 149 F.3d at 188).

The first element of conspiracy, an agreement, can be explicit or implicit, and can be inferred from the participants' conduct or from other direct or circumstantial evidence. *See McKee*, 506 F.3d at 238 (citing cases). The Government produced evidence that Malik presented himself as someone who could assist people without adequate English language knowledge to pass the citizenship test (*see, e.g.*, Trial Tr. 66-68, 104, 109, July 14, 2009; Trial Tr. 119-22, July 16, 2009), and that Malik proceeded to provide "assistance" to those individuals without even inquiring as to their educational background, personal history, or language ability (*see, e.g.*, Trial Tr. 180, July 14, 2009; Trial Tr. 119-21, July 15, 2009). The Government presented evidence that from 2001 through 2003, Malik brought applicants for naturalization to Weiner, who then completed N-648 forms for the applicants. (Trial Tr. 211, 257-58, July 16, 2009.) The Government presented evidence that Vorasingha performed this role in 2005. (*Id.* at 154.) Weiner diagnosed nearly every single applicant whose N-648 form he completed with mental retardation and other psychological conditions, stating that those conditions made the applicant unable to learn English. (*See* Trial Tr. 108-11, July 16, 2009 (noting that 97% of N-648 forms

completed by Weiner that the Government had discovered included a diagnosis of retardation, and presenting frequency of other diagnoses).)  The language that Weiner used to complete the N-648 forms was virtually identical for each applicant.  (*Compare* Trial Tr. 75-76, 80, July 14, 2009 (diagnosis of Nimer Fares), *with id.* at 187-89 (diagnosis of Sofiene Khelifi), *id.* at 240 (diagnosis of Ali Ali), *id.* at 314-15 (diagnosis of Mershad Haj), Trial Tr. 76, July 15, 2009 (diagnosis of Rehab Hoshan), *id.* at 100 (diagnosis of Adib Fares), *id.* at 190 (diagnosis of Najah Manassra), *id.* at 212 (diagnosis of Wesal Ahmad), *id.* at 241 (diagnosis of Besam Awawdeh); Trial Tr. 14, July 16, 2009 (diagnosis of Ayman Mustafa)).  Likewise, Vorasingha diagnosed every applicant whose N-648 forms he completed with a cognitive disorder and other psychological conditions, stating that those conditions made them unable to learn English.  (*See* Trial Tr. 110-11, July 16, 2009 (noting that all N-648 forms that Vorasingha had filled out that the Government had discovered included a diagnosis of some form of a cognitive disorder).) Vorasingha too used virtually identical language in completing the forms.  (*Compare id.* at 93-94 (diagnosis of Indiraben Patel), *with id.* at 99 (diagnosis of Sudhaben Patel), Trial Tr. 287-90, July 15, 2009 (diagnosis of Kantilal Patel)).

There was further evidence that Weiner completed N-648 forms for each of the approximately 130 applicants brought to him by Malik (Trial Tr. 271-72, 306, July 16, 2009); that Weiner stated that each of those applicants was incapable of learning English (*id.* at 271-72, 306); that Malik usually met with Weiner alone before or after Weiner met with each of the applicants (*see, e.g.*, *id.* at 215-17; Trial Tr. 72, July 14, 2009; Trial Tr. 97-98, July 15, 2009); that in filling out each applicant's N-648 form, Weiner's objective was to support the conclusion that the applicant could not learn English (Trial Tr. 221-22, 306, July 16, 2009); and that Weiner

stated that applicants could not learn basic English even in instances when those applicants communicated with him in English (*see, e.g.*, Gov't Ex. 2F at 1-2; Trial Tr. 74, 181, 189, July 14, 2009).

Weiner challenges the inference of the existence of a conspiracy between him and Malik, urging that evidence of Malik's non-use of many of the N-648s completed by Weiner, as well as Malik's late submission of some of the forms, suggests that they were not working in concert. (Doc. No. 105 at 7.)  That is certainly an inference that one could draw from the evidence. However, the jury could also reasonably determine that there were other reasons for not submitting the completed N-648 with an applicant's other naturalization documents.  *See Dent*, 149 F.3d at 180 (noting that the existence of other explanations for the defendant's conduct does not negate the inference of the existence of a conspiracy if other evidence sufficiently supports it).  For example, Sofiene Khelifi was told by Malik to take the citizenship test because his English was good enough, even though Weiner had already completed and signed Khelifi's N-648, in which he concluded that Khelifi could not even learn basic words in a new language. (Trial Tr. 195-96, July 14, 2009; Gov't Ex. 6B at 1.)  Moreover, evidence that Malik submitted some of the N-648s completed by Weiner too late to be considered by CIS does not negate the existence of an agreement between Malik and Weiner.

In addition, as briefly discussed above, the Government presented evidence that of the 76 N-648 forms that it had discovered that were completed by Weiner, 97% contained a diagnosis of retardation, 92% of post-traumatic stress disorder (PTSD), 91% of depression, and 83% of learning disability.  (Gov't Ex. 15; Trial Tr. 107-09, July 16, 2009.)  The Government also presented an excerpt from the Diagnostic and Statistical Manual of Mental Disorders ("DSM")

pertaining to DSM Code 319, "Mental Retardation, Severity Unspecified," a code with which Weiner admitted he had diagnosed dozens of people. (Trial Tr. 295-97, July 16, 2009; Gov't Ex. 36.) That excerpt indicates that "[t]he prevalence rate of mental retardation has been estimated at approximately one percent. However, different studies have reported different rates depending on definitions used, methods of ascertainment, and population studied." (Gov't Ex. 36 at 44, 46.) Weiner sought to attribute the prevalence of mental retardation, PTSD, depression, and learning disabilities in his diagnoses to his assumption that the applicants brought to him by Malik "were being pre-screened for inability to learn English." (Trial Tr. 320-21, July 16, 2009; *see also id.* at 305.) Clearly, the jury gave little credence to this assertion. Weiner knew that Malik was not a medical doctor and was not qualified to screen applicants based upon an inability to learn English. (*Id.* at 305-06).

A jury could certainly have inferred, in light of all of the evidence concerning the nature of Weiner's meetings with applicants brought to him by Malik, that Weiner diagnosed 97% of the 76 applicants analyzed in Government's Exhibit 15 with retardation because making such diagnoses was part of his agreement with Malik, rather than because he was exercising his independent medical judgment. The jury's conclusion is obviously strengthened by the evidence that Weiner clearly lied about the background of several applicants and the effect of that background on their ability to learn English.

The Government presented similar evidence against Vorasingha. Sophy Phork worked as a translator in Vorasingha's office. Phork testified that Vorasingha did not ordinarily diagnose or treat people with mental illnesses, instead referring them to a psychiatrist. (Trial Tr. 133, July 15, 2009.) However, the evidence established that Vorasingha did diagnose mental illnesses for

individuals brought to him by Malik for whom he completed N-648 forms. (*See, e.g.*, Gov't Exs. 8B & 9D.) He did not refer those individuals to a psychiatrist. Phork also testified that she knew Malik as a person who brought in his clients—who were not Vorasingha's regular patients—for Vorasingha to complete their N-648s. (Trial Tr. 148-49, July 15, 2009.) According to Phork, Vorasingha completed an N-648 form for everyone whom Malik brought to his office. (*Id.* at 150.) For applicants who did not speak English, Malik would act as a translator when they met with the doctor. (*Id.* at 155-56, 164.) Phork stated that Vorasingha met with the applicant for 10 to 20 minutes, during which time he checked the applicant's heart but performed no other exams. (*Id.* at 145-46.) The testimony of Kantilal Patel, whom Malik brought to Vorasingha to have his N-648 completed, corroborated Phork's testimony. Patel testified that when he and Malik got to Vorasingha's office, Malik talked to Vorasingha before the doctor met with Patel. (*Id.* at 303.) Vorasingha then met with Patel in Malik's presence. (*Id.* at 285.) Vorasingha took Patel's blood pressure and examined his chest but performed no other exams. (*Id.* at 286.) At some point, Vorasingha asked Patel a few questions, and Malik then brought Patel a form to sign. (*Id.* at 305.) Patel's N-648, completed by Vorasingha, diagnosed him with dementia due to senility, a cognitive disorder, and impaired memory, all impairing his ability to learn new things. (Gov't Ex. 11F at 1-2.)

From the totality of this evidence, a rational jury could have reasonably inferred the existence of a preconceived plan or common understanding between Malik and Weiner, and another between Malik and Vorasingha, that each doctor would provide false information on N-648 forms for the individuals brought to them by Malik, indicating that those individuals could not learn English or U.S. history and civics. *See Brodie*, 403 F.3d 134 (noting that in conducting

an inquiry into sufficiency of the evidence to sustain a conviction, courts "do not view the government's evidence in isolation, but rather, in conjunction and as a whole"); *see also McKee*, 506 F.3d at 238 (observing that "indirect evidence of a mere tacit understanding will suffice" to establish an agreement among alleged co-conspirators (citing *United States v. Barr*, 963 F.2d 641, 650 (3d Cir. 1992))).

With regard to the second element of conspiracy, the commission of an overt act by one of the conspirators in furtherance of the objective of the conspiracy, the Government has presented more than sufficient evidence of such acts by all three Defendants. "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *See McKee*, 506 F.3d at 243 (citing *United States v. Falcone*, 311 U.S. 205, 207 (1940)). Certainly, the bringing of applicants to Weiner and to Vorasingha for the purpose of completing N-648s for those applicants are overt acts in furtherance of the objectives of the conspiracies. Weiner's and Vorasingha's meetings with and completion of N-648s are obviously also overt acts in furtherance of the conspiracies. (*See, e.g.*, Gov't Exs. 1E, 2F, 6B, 8B, 9D, and 11F.)

As for the third element of conspiracy—the intent on the part of the conspirators to agree and to defraud the United States—the preceding discussion of the evidence of an agreement and overt acts by the co-conspirators is equally applicable here. *See McKee*, 506 F.3d at 241 ("A defendant's knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy." (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943))). Weiner's deliberate participation in the conspiracy can be inferred from the evidence that he included information in applicants' forms that he did not receive from those applicants and which was

shown at trial to be false, and that he filled out N-648 forms for all applicants brought to him by

Malik. (*See, e.g.*, Trial Tr. 215-17, 306, July 16, 2009.) Further, Weiner testified that he simply

assumed that all the applicants brought to him by Malik had psychological problems and that in

filling out each applicant's N-648 form his main objective was to come up with a diagnosis that

would back up a finding that the given applicant could not learn English. (*Id.* at 221-22, 306.)

Likewise, Vorasingha's deliberate participation in the conspiracy is clear. Vorasingha completed

N-648 forms for applicants brought to him by Malik, even though he ordinarily referred patients

with mental illnesses to a psychiatrist. (Trial Tr. 133, 148-50, July 15, 2009.) Moreover, he

completed N-648 forms for all applicants brought to him by Malik. (*Id.* at 150.) Evidence that

Vorasingha diagnosed applicants on the basis of a short questionnaire administered to them by a

translator in his office also supports the inference. From all of this evidence, a jury could

reasonably conclude that Weiner and Vorasingha knowingly and wilfully participated in the

scheme to provide false information on applicants' N-648 forms so that the applicants could

avoid taking the English language and U.S. history and civics portions of the citizenship exam, as

required by law.

We are satisfied that the evidence was more than sufficient to support the jury's

conclusion that Weiner and Malik, as well as Vorasingha and Malik, intended to work together to

achieve the common goal of interfering with or obstructing the lawful function of U.S.

immigration authorities by assisting unqualified naturalization applicants to obtain waivers from

certain U.S. citizenship requirements, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1425.

### E. Defendants' Motion for a New Trial

Under Rule 33, unlike Rule 29, we can evaluate the credibility of witnesses and weigh

evidence.  Having done so, we are satisfied that the evidence of the guilt of Defendants was overwhelming.  There was no miscarriage of justice here.  Defendants' motions must be denied.

V.      **CONCLUSION**

We conclude that there is a variance between Count One of the Indictment and the evidence presented at trial.  We conclude, however, that the variance did not prejudice any of Defendants' substantial rights.  We also find that the evidence supported the jury's findings on all counts.  Accordingly, for all of the reasons set forth above, Defendants' post-trial motions were denied by Order dated December 4, 2009.

BY THE COURT:

_____
R. Barclay Surrick, J.

44